**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

KENNETH M. ZERAN,
Plaintiff-Appellant,

v.                                                    No. 97-1523

AMERICA ONLINE, INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-96-1564-A)

Argued: October 2, 1997

Decided: November 12, 1997

Before WILKINSON, Chief Judge, RUSSELL, Circuit Judge, and
BOYLE, Chief United States District Judge for the
Eastern District of North Carolina, sitting by designation.

_____

Affirmed by published opinion. Chief Judge Wilkinson wrote the
opinion, in which Judge Russell and Chief Judge Boyle joined.

_____

**COUNSEL**

**ARGUED:** John Saul Edwards, LAW OFFICES OF JOHN S.
EDWARDS, Roanoke, Virginia; Leo Kayser, III, KAYSER & RED-
FERN, New York, New York, for Appellant. Patrick Joseph Carome,
WILMER, CUTLER & PICKERING, Washington, D.C., for Appel-
lee. **ON BRIEF:** John Payton, Samir Jain, WILMER, CUTLER &

PICKERING, Washington, D.C.; Randall J. Boe, AMERICA ONLINE, INC., Dulles, Virginia, for Appellee.

_____

**OPINION**

WILKINSON, Chief Judge:

Kenneth Zeran brought this action against America Online, Inc. ("AOL"), arguing that AOL unreasonably delayed in removing defamatory messages posted by an unidentified third party, refused to post retractions of those messages, and failed to screen for similar postings thereafter. The district court granted judgment for AOL on the grounds that the Communications Decency Act of 1996 ("CDA") -- 47 U.S.C. § 230 -- bars Zeran's claims. Zeran appeals, arguing that § 230 leaves intact liability for interactive computer service providers who possess notice of defamatory material posted through their services. He also contends that § 230 does not apply here because his claims arise from AOL's alleged negligence prior to the CDA's enactment. Section 230, however, plainly immunizes computer service providers like AOL from liability for information that originates with third parties. Furthermore, Congress clearly expressed its intent that § 230 apply to lawsuits, like Zeran's, instituted after the CDA's enactment. Accordingly, we affirm the judgment of the district court.

I.

"The Internet is an international network of interconnected computers," currently used by approximately 40 million people worldwide. Reno v. ACLU, 117 S. Ct. 2329, 2334 (1997). One of the many means by which individuals access the Internet is through an interactive computer service. These services offer not only a connection to the Internet as a whole, but also allow their subscribers to access information communicated and stored only on each computer service's individual proprietary network. Id. AOL is just such an interactive computer service. Much of the information transmitted over its network originates with the company's millions of subscribers. They may transmit information privately via electronic mail, or they may communicate publicly by posting messages on AOL bulletin boards, where the messages may be read by any AOL subscriber.

2

The instant case comes before us on a motion for judgment on the pleadings, see Fed. R. Civ. P. 12(c), so we accept the facts alleged in the complaint as true. Bruce v. Riddle, 631 F.2d 272, 273 (4th Cir. 1980). On April 25, 1995, an unidentified person posted a message on an AOL bulletin board advertising "Naughty Oklahoma T-Shirts." The posting described the sale of shirts featuring offensive and tasteless slogans related to the April 19, 1995, bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Those interested in purchasing the shirts were instructed to call "Ken" at Zeran's home phone number in Seattle, Washington. As a result of this anonymously perpetrated prank, Zeran received a high volume of calls, comprised primarily of angry and derogatory messages, but also including death threats. Zeran could not change his phone number because he relied on its availability to the public in running his business out of his home. Later that day, Zeran called AOL and informed a company representative of his predicament. The employee assured Zeran that the posting would be removed from AOL's bulletin board but explained that as a matter of policy AOL would not post a retraction. The parties dispute the date that AOL removed this original posting from its bulletin board.

On April 26, the next day, an unknown person posted another message advertising additional shirts with new tasteless slogans related to the Oklahoma City bombing. Again, interested buyers were told to call Zeran's phone number, to ask for "Ken," and to "please call back if busy" due to high demand. The angry, threatening phone calls intensified. Over the next four days, an unidentified party continued to post messages on AOL's bulletin board, advertising additional items including bumper stickers and key chains with still more offensive slogans. During this time period, Zeran called AOL repeatedly and was told by company representatives that the individual account from which the messages were posted would soon be closed. Zeran also reported his case to Seattle FBI agents. By April 30, Zeran was receiving an abusive phone call approximately every two minutes.

Meanwhile, an announcer for Oklahoma City radio station KRXO received a copy of the first AOL posting. On May 1, the announcer related the message's contents on the air, attributed them to "Ken" at Zeran's phone number, and urged the listening audience to call the number. After this radio broadcast, Zeran was inundated with death

3

threats and other violent calls from Oklahoma City residents. Over the next few days, Zeran talked to both KRXO and AOL representatives. He also spoke to his local police, who subsequently surveilled his home to protect his safety. By May 14, after an Oklahoma City newspaper published a story exposing the shirt advertisements as a hoax and after KRXO made an on-air apology, the number of calls to Zeran's residence finally subsided to fifteen per day.

Zeran first filed suit on January 4, 1996, against radio station KRXO in the United States District Court for the Western District of Oklahoma. On April 23, 1996, he filed this separate suit against AOL in the same court. Zeran did not bring any action against the party who posted the offensive messages.[1] After Zeran's suit against AOL was transferred to the Eastern District of Virginia pursuant to 28 U.S.C. § 1404(a), AOL answered Zeran's complaint and interposed 47 U.S.C. § 230 as an affirmative defense. AOL then moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). The district court granted AOL's motion, and Zeran filed this appeal.

II.

A.

Because § 230 was successfully advanced by AOL in the district court as a defense to Zeran's claims, we shall briefly examine its operation here. Zeran seeks to hold AOL liable for defamatory speech initiated by a third party. He argued to the district court that once he notified AOL of the unidentified third party's hoax, AOL had a duty to remove the defamatory posting promptly, to notify its subscribers of the message's false nature, and to effectively screen future defamatory material. Section 230 entered this litigation as an affirmative defense pled by AOL. The company claimed that Congress immunized interactive computer service providers from claims based on information posted by a third party.

_____

[1] Zeran maintains that AOL made it impossible to identify the original party by failing to maintain adequate records of its users. The issue of AOL's record keeping practices, however, is not presented by this appeal.

4

The relevant portion of § 230 states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).**2** By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service. Specifically, § 230 precludes courts from entertaining claims that would place a computer service provider in a publisher's role. Thus, lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions -- such as deciding whether to publish, withdraw, postpone or alter content -- are barred.

The purpose of this statutory immunity is not difficult to discern. Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech. Section 230 was enacted, in part, to maintain the robust nature of Internet communication and, accordingly, to keep government interference in the medium to a minimum. In specific statutory findings, Congress recognized the Internet and interactive computer services as offering "a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." Id. § 230(a)(3). It also found that the Internet and interactive computer services "have flourished, to the benefit of all Americans, with a mini-

_____

**2** Section 230 defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions." 47 U.S.C. § 230(e)(2). The term "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." Id. § 230(e)(3). The parties do not dispute that AOL falls within the CDA's "interactive computer service" definition and that the unidentified third party who posted the offensive messages here fits the definition of an "information content provider."

mum of government regulation." Id.§ 230(a)(4) (emphasis added). Congress further stated that it is "the policy of the United States . . . to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." Id. § 230(b)(2) (emphasis added).

None of this means, of course, that the original culpable party who posts defamatory messages would escape accountability. While Congress acted to keep government regulation of the Internet to a minimum, it also found it to be the policy of the United States "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." Id. § 230(b)(5). Congress made a policy choice, however, not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages.

Congress' purpose in providing the § 230 immunity was thus evident. Interactive computer services have millions of users. See Reno v. ACLU, 117 S. Ct. at 2334 (noting that at time of district court trial, "commercial online services had almost 12 million individual subscribers"). The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

Another important purpose of § 230 was to encourage service providers to self-regulate the dissemination of offensive material over their services. In this respect, § 230 responded to a New York state court decision, Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995). There, the plaintiffs sued Prodigy -- an interactive computer service like AOL -- for defamatory comments made by an unidentified party on one of Prodigy's

6

bulletin boards. The court held Prodigy to the strict liability standard normally applied to original publishers of defamatory statements, rejecting Prodigy's claims that it should be held only to the lower "knowledge" standard usually reserved for distributors. The court reasoned that Prodigy acted more like an original publisher than a distributor both because it advertised its practice of controlling content on its service and because it actively screened and edited messages posted on its bulletin boards.

Congress enacted § 230 to remove the disincentives to self-regulation created by the Stratton Oakmont decision. Under that court's holding, computer service providers who regulated the dissemination of offensive material on their services risked subjecting themselves to liability, because such regulation cast the service provider in the role of a publisher. Fearing that the specter of liability would therefore deter service providers from blocking and screening offensive material, Congress enacted § 230's broad immunity "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material." 47 U.S.C. § 230(b)(4). In line with this purpose, § 230 forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions.

B.

Zeran argues, however, that the § 230 immunity eliminates only publisher liability, leaving distributor liability intact. Publishers can be held liable for defamatory statements contained in their works even absent proof that they had specific knowledge of the statement's inclusion. W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 113, at 810 (5th ed. 1984). According to Zeran, interactive computer service providers like AOL are normally considered instead to be distributors, like traditional news vendors or book sellers. Distributors cannot be held liable for defamatory statements contained in the materials they distribute unless it is proven at a minimum that they have actual knowledge of the defamatory statements upon which liability is predicated. Id. at 811 (explaining that distributors are not liable "in the absence of proof that they knew or had reason to know of the existence of defamatory matter contained in matter published").

7

Zeran contends that he provided AOL with sufficient notice of the defamatory statements appearing on the company's bulletin board. This notice is significant, says Zeran, because AOL could be held liable as a distributor only if it acquired knowledge of the defamatory statements' existence.

Because of the difference between these two forms of liability, Zeran contends that the term "distributor" carries a legally distinct meaning from the term "publisher." Accordingly, he asserts that Congress' use of only the term "publisher" in § 230 indicates a purpose to immunize service providers only from publisher liability. He argues that distributors are left unprotected by § 230 and, therefore, his suit should be permitted to proceed against AOL. We disagree. Assuming arguendo that Zeran has satisfied the requirements for imposition of distributor liability, this theory of liability is merely a subset, or a species, of publisher liability, and is therefore also foreclosed by § 230.

The terms "publisher" and "distributor" derive their legal significance from the context of defamation law. Although Zeran attempts to artfully plead his claims as ones of negligence, they are indistinguishable from a garden variety defamation action. Because the publication of a statement is a necessary element in a defamation action, only one who publishes can be subject to this form of tort liability. Restatement (Second) of Torts § 558(b) (1977); Keeton et al., supra, § 113, at 802. Publication does not only describe the choice by an author to include certain information. In addition, both the negligent communication of a defamatory statement and the failure to remove such a statement when first communicated by another party -- each alleged by Zeran here under a negligence label -- constitute publication. Restatement (Second) of Torts § 577; see also Tacket v. General Motors Corp., 836 F.2d 1042, 1046-47 (7th Cir. 1987). In fact, every repetition of a defamatory statement is considered a publication. Keeton et al., supra, § 113, at 799.

In this case, AOL is legally considered to be a publisher. "[E]very one who takes part in the publication . . . is charged with publication." Id. Even distributors are considered to be publishers for purposes of defamation law:

8

> Those who are in the business of making their facilities available to disseminate the writings composed, the speeches made, and the information gathered by others may also be regarded as participating to such an extent in making the books, newspapers, magazines, and information available to others as to be regarded as publishers. They are intentionally making the contents available to others, sometimes without knowing all of the contents -- including the defamatory content -- and sometimes without any opportunity to ascertain, in advance, that any defamatory matter was to be included in the matter published.

Id. at 803. AOL falls squarely within this traditional definition of a publisher and, therefore, is clearly protected by § 230's immunity.

Zeran contends that decisions like Stratton Oakmont and Cubby, Inc. v. CompuServe Inc., 776 F. Supp. 135 (S.D.N.Y. 1991), recognize a legal distinction between publishers and distributors. He misapprehends, however, the significance of that distinction for the legal issue we consider here. It is undoubtedly true that mere conduits, or distributors, are subject to a different standard of liability. As explained above, distributors must at a minimum have knowledge of the existence of a defamatory statement as a prerequisite to liability. But this distinction signifies only that different standards of liability may be applied within the larger publisher category, depending on the specific type of publisher concerned. See Keeton et al., supra, § 113, at 799-800 (explaining that every party involved is charged with publication, although degrees of legal responsibility differ). To the extent that decisions like Stratton and Cubby utilize the terms "publisher" and "distributor" separately, the decisions correctly describe two different standards of liability. Stratton and Cubby do not, however, suggest that distributors are not also a type of publisher for purposes of defamation law.

Zeran simply attaches too much importance to the presence of the distinct notice element in distributor liability. The simple fact of notice surely cannot transform one from an original publisher to a distributor in the eyes of the law. To the contrary, once a computer service provider receives notice of a potentially defamatory posting, it is thrust into the role of a traditional publisher. The computer service

9

provider must decide whether to publish, edit, or withdraw the posting. In this respect, Zeran seeks to impose liability on AOL for assuming the role for which § 230 specifically proscribes liability -- the publisher role.

Our view that Zeran's complaint treats AOL as a publisher is reinforced because AOL is cast in the same position as the party who originally posted the offensive messages. According to Zeran's logic, AOL is legally at fault because it communicated to third parties an allegedly defamatory statement. This is precisely the theory under which the original poster of the offensive messages would be found liable. If the original party is considered a publisher of the offensive messages, Zeran certainly cannot attach liability to AOL under the same theory without conceding that AOL too must be treated as a publisher of the statements.

Zeran next contends that interpreting § 230 to impose liability on service providers with knowledge of defamatory content on their services is consistent with the statutory purposes outlined in Part IIA. Zeran fails, however, to understand the practical implications of notice liability in the interactive computer service context. Liability upon notice would defeat the dual purposes advanced by § 230 of the CDA. Like the strict liability imposed by the Stratton Oakmont court, liability upon notice reinforces service providers' incentives to restrict speech and abstain from self-regulation.

If computer service providers were subject to distributor liability, they would face potential liability each time they receive notice of a potentially defamatory statement -- from any party, concerning any message. Each notification would require a careful yet rapid investigation of the circumstances surrounding the posted information, a legal judgment concerning the information's defamatory character, and an on-the-spot editorial decision whether to risk liability by allowing the continued publication of that information. Although this might be feasible for the traditional print publisher, the sheer number of postings on interactive computer services would create an impossible burden in the Internet context. Cf. Auvil v. CBS 60 Minutes, 800 F. Supp. 928, 931 (E.D. Wash. 1992) (recognizing that it is unrealistic for network affiliates to "monitor incoming transmissions and exercise on-the-spot discretionary calls"). Because service providers

10

would be subject to liability only for the publication of information, and not for its removal, they would have a natural incentive simply to remove messages upon notification, whether the contents were defamatory or not. See Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 777 (1986) (recognizing that fears of unjustified liability produce a chilling effect antithetical to First Amendment's protection of speech). Thus, like strict liability, liability upon notice has a chilling effect on the freedom of Internet speech.

Similarly, notice-based liability would deter service providers from regulating the dissemination of offensive material over their own services. Any efforts by a service provider to investigate and screen material posted on its service would only lead to notice of potentially defamatory material more frequently and thereby create a stronger basis for liability. Instead of subjecting themselves to further possible lawsuits, service providers would likely eschew any attempts at self-regulation.

More generally, notice-based liability for interactive computer service providers would provide third parties with a no-cost means to create the basis for future lawsuits. Whenever one was displeased with the speech of another party conducted over an interactive computer service, the offended party could simply "notify" the relevant service provider, claiming the information to be legally defamatory. In light of the vast amount of speech communicated through interactive computer services, these notices could produce an impossible burden for service providers, who would be faced with ceaseless choices of suppressing controversial speech or sustaining prohibitive liability. Because the probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes, we will not assume that Congress intended to leave liability upon notice intact.

Zeran finally contends that the interpretive canon favoring retention of common law principles unless Congress speaks directly to the issue counsels a restrictive reading of the § 230 immunity here. See United States v. Texas, 507 U.S. 529, 534 (1993). This interpretive canon does not persuade us to reach a different result. Here, Congress has indeed spoken directly to the issue by employing the legally sig-

11

nificant term "publisher," which has traditionally encompassed distributors and original publishers alike.

The decision cited by Zeran, United States v. Texas, also recognized that abrogation of common law principles is appropriate when a contrary statutory purpose is evident. Id. This is consistent with the Court's earlier cautions against courts' application of the canon with excessive zeal: "`The rule that statutes in derogation of the common law are to be strictly construed does not require such an adherence to the letter as would defeat an obvious legislative purpose or lessen the scope plainly intended to be given to the measure.'" Isbrandtsen Co. v. Johnson, 343 U.S. 779, 783 (1952) (quoting Jamison v. Encarnacion, 281 U.S. 635, 640 (1930)); cf. Astoria Fed. Sav. & Loan Ass'n v. Solimino, 501 U.S. 104, 110-11 (1991) (statute need not expressly delimit manner in which common law principle is abrogated). Zeran's argument flies in the face of this warning. As explained above, interpreting § 230 to leave distributor liability in effect would defeat the two primary purposes of the statute and would certainly "lessen the scope plainly intended" by Congress' use of the term "publisher."

Section 230 represents the approach of Congress to a problem of national and international dimension. The Supreme Court underscored this point in ACLU v. Reno, finding that the Internet allows "tens of millions of people to communicate with one another and to access vast amounts of information from around the world.[It] is `a unique and wholly new medium of worldwide human communication.'" 117 S. Ct. at 2334 (citation omitted). Application of the canon invoked by Zeran here would significantly lessen Congress' power, derived from the Commerce Clause, to act in a field whose international character is apparent. While Congress allowed for the enforcement of "any State law that is consistent with [§ 230]," 47 U.S.C. § 230(d)(3), it is equally plain that Congress' desire to promote unfettered speech on the Internet must supersede conflicting common law causes of action. Section 230(d)(3) continues: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." With respect to federal-state preemption, the Court has advised: "[W]hen Congress has `unmistakably . . . ordained,' that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall. The

12

result is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Jones v. Rath Packing Co., 430 U.S. 519, 525 (1977) (citations omitted). Here, Congress' command is explicitly stated. Its exercise of its commerce power is clear and counteracts the caution counseled by the interpretive canon favoring retention of common law principles.

III.

The CDA was signed into law and became effective on February 8, 1996. Zeran did not file his complaint until April 23, 1996. Zeran contends that even if § 230 does bar the type of claim he brings here, it cannot be applied retroactively to bar an action arising from AOL's alleged misconduct prior to the CDA's enactment. We disagree. Section 230 applies by its plain terms to complaints brought after the CDA became effective. As noted in Part IIB, the statute provides, in part: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(d)(3).

Initially, it is doubtful that a retroactivity issue is even presented here. Retroactivity concerns arise when a statute applies to conduct predating its enactment. Section 230 does not directly regulate the activities of interactive computer service providers like AOL. Instead, § 230 is addressed only to the bringing of a cause of action. Here, Zeran did not file his complaint until over two months after § 230's immunity became effective. Thus, the statute's application in this litigation is in fact prospective. See St. Louis v. Texas Worker's Compensation Comm'n, 65 F.3d 43, 46 (5th Cir. 1995) (holding "issue is not technically one of retroactivity" when statute applies to "filing of the complaint"), cert. denied, 116 S. Ct. 2563 (1996); Vernon v. Cassadega Valley Central Sch. Dist., 49 F.3d 886, 889 (2d Cir. 1995) (same).

Even if this were a case implicating the application of a federal statute to pre-enactment events, the Supreme Court's Landgraf framework would nevertheless require § 230's application to Zeran's claims. Landgraf instructs us first "to determine whether Congress has expressly prescribed the statute's proper reach." Landgraf v. USI

13

Film Prods., 511 U.S. 244, 280 (1994). This case can be resolved at this first step. In § 230(d)(3), Congress clearly expressed its intent that the statute apply to any complaint instituted after its effective date, regardless of when the relevant conduct giving rise to the claims occurred. Other circuits have interpreted similar statutory language to clearly express Congress' intent that the relevant statutes apply to bar new actions under statutorily specified conditions. See Wright v. Morris, 111 F.3d 414, 418 (6th Cir. 1997) (holding language "No action shall be brought . . . ," 42 U.S.C. § 1997e(a), to "expressly govern[ ] the bringing of new actions"), cert. denied, 1997 WL 275340 (U.S. Oct. 6, 1997); Abdul-Wadood v. Nathan, 91 F.3d 1023, 1025 (7th Cir. 1996) (holding language "In no event shall a prisoner bring a civil action or appeal a judgment . . . ," 28 U.S.C. § 1915(g), to govern the bringing of new actions or filing of new appeals).

If we were to find a directive as plain as § 230(d)(3) to be ambiguous as to Congress' intent, we would be announcing a new super-clear-statement condition for the retroactive operation of statutes. Such a jurisprudential shift would be both unwise and contrary to the Court's admonitions in Landgraf: "Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary." 511 U.S. at 267-68. Here, Congress decided that free speech on the Internet and self-regulation of offensive speech were so important that § 230 should be given immediate, comprehensive effect.

There finally is a significant contrast between statutes that impose new liabilities for already-completed conduct and statutes that govern litigants' access to courts. For example, courts often apply intervening statutes that restrict a court's jurisdiction. See Landgraf, 511 U.S. at 274. Section 230 neither imposes any new liability on Zeran nor takes away any rights acquired under prior law. No person has a vested right in a nonfinal tort judgment, much less an unfiled tort claim. Hammond v. United States, 786 F.2d 8, 12 (1st Cir. 1986). Furthermore, Zeran cannot point to any action he took in reliance on the law prior to § 230's enactment. Because § 230 has no untoward retroactive effect, even the presumption against statutory retroactivity absent an express directive from Congress is of no help to Zeran here.

14

IV.

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

15