**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

JEFFREY A. AND LISA S. HILL, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED, PLAINTIFFS v. STUBHUB, INC. D/B/A "STUBHUB!" AND/OR "STUBHUB.COM", JUSTIN HOLOHAN, AND "JOHN DOE SELLERS 2" ET. AL., DEFENDANTS

No. COA11-685

(Filed 6 March 2012)

**1. Appeal and Error—appealability—interests of justice—online ticket broker**

The Court of Appeals granted *certiorari* in the interests of justice in an appeal from a summary judgment for plaintiffs in an action challenging an online marketplace for tickets as violating ticket resale statutes and being an unfair trade practice.

**2. Brokers—online tickets—exemption from liability—exceptions**

In order for a website to lose the benefit of the exemption from liability granted by 47 U.S.C. § 230 (which provided an exemption for information provided by another content provider), the website must effectively control the content posted by third parties or take other actions which essentially ensure the creation of unlawful material.

**3. Brokers—online ticket sales—exemption from liability—unlawful activity**

The trial court erred by using an erroneous "entire website" approach and granting summary judgment for plaintiffs in an action against an online ticket broker where defendants claimed the immunity created by 47 U.S.C. § 230. Focusing upon the specific content at issue in this case, the undisputed evidence established that defendant simply functioned as a broker, effectively putting a buyer and seller into contact with each other to facilitate a sale at a price established by the seller. The fact that defendant may have been on notice that its website could be used to make unlawful sales and that certain of defendant's practices may have provided incentives for the overpricing of certain tickets did not support a decision stripping defendant of its immunity under the federal statute.

**4. Brokers—online ticket sales—fees—defendant neither a seller nor an agent—independent services**

The trial court erred by determining that the fees charged by an online ticket broker violated N.C.G.S. § 14-33 where the undis-

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

puted evidence established that defendant was neither a ticket seller nor the ticket seller's agent. Defendant provided an independent brokerage function so that its fees related to its own services rather than the services provided by the seller.

Appeal by defendant from judgment entered 4 March 2011 by Judge Ben F. Tennille in Guilford County Superior Court. Heard in the Court of Appeals 4 December 2011.

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Jeffrey E. Oleynik and Charles E. Coble, and the Law Offices of Jeffrey K. Peraldo, PA, by Kara W. Edmunds and Jeffrey K. Peraldo for Plaintiffs Jeffrey A. and Lisa S. Hill.*

*K&L Gates, LLP, by John H. Culver III, and Molly L. McIntosh; Weil, Gotshal & Manges LLP, by David J. Lender; and Cooley Godward Kronish LLP, by Michael G. Rhodes, for Defendant StubHub, Inc.*

*Wilmer Cutler Pickering Hale & Dorr LLP, by Patrick J. Carome, Samir Jain, Daniel P. Kearney, Jr., and Womble Carlyle Sandridge & Rice, PLLC, by Burley B. Mitchell, Jr., and Robert T. Numbers II, for Amicus Curiae Center for Democracy & Technology; Computer & Communications Industry Association; Consumer Electronics Association; Ebay, Inc.; Electronic Frontier Foundation; Internet Commerce Coalition; NetChoice; NetCoalition; Public Knowledge; TechAmerica; and TechNet.*

ERVIN, Judge.

Defendant StubHub appeals from an order granting summary judgment in favor of Plaintiffs Jeffrey A. and Lisa S. Hill with respect to their claim that Defendant engaged in unfair or deceptive trade practices by violating the provisions of N.C. Gen. Stat. § 14-344. On appeal, Defendant argues that Plaintiffs' "ticket scalping" claim is barred by 47 U.S.C. § 230 and that Defendant did not violate the "fee" provisions of N.C. Gen. Stat. § 14-344. After careful consideration of Defendant's challenges to the trial court's order in light of the record and the applicable law, we conclude that the trial court's order should be reversed.

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

## I. Background

### A. Substantive Facts

Defendant operates an online marketplace that enables third parties to buy and sell tickets to sporting contests, concerts, and similar events. Among other things, Defendant serves as an intermediary between buyers and sellers in order to facilitate transactions in which the identities of the buyer and the seller are not disclosed to each other. As part of that process, sellers are provided with prepaid FedEx™ labels for shipping tickets; a guarantee of payment even if the buyer uses an invalid or fraudulent credit card; and the assurance that Defendant will assist in resolving any customer service issues that might arise. On the other hand, buyers are assured that they will receive valid tickets, or tickets of the same or equal value, in a timely manner.

In order to consummate a transaction using Defendant's website, a person must first create a user account, a process that requires the person to provide personal information and agree to abide by the terms and conditions set out in a User Agreement. The User Agreement requires the user to agree to refrain from "us[ing] this Site for unlawful purposes or in an unlawful manner" and "to comply with all applicable local, state[,] federal and international laws, statutes and regulations regarding use of the Site and the selling of tickets," including regulations governing the "selling value of the tickets."[1]

In the event that a ticket sale occurs, Defendant charges both parties for its services, with 10% of the ticket price deducted from the proceeds that would otherwise be payable to the seller and 15% of the ticket price, plus a shipping fee, added to the buyer's total cost. Defendant calculates the total amount due and provides the buyer with that information, processes the buyer's payment, and remits the amount at which the ticket sold, less Defendant's fee, to the seller. As a result, the seller does not receive the buyer's credit card information and the buyer does not learn the identity of the seller.

In September, 2007, Plaintiffs decided to buy tickets to a "Miley Cyrus as Hannah Montana" concert to be held at the Greensboro Coliseum in November, 2007. After unsuccessfully attempting to

---

1. In addition, Defendant provided notice that ticket scalping is illegal in North Carolina and reminded potential buyers that the price of tickets sold through its website might exceed face value. However, Defendant also instructed potential sellers not to show the face value of the tickets that they were attempting to resell.

purchase tickets to this event using the Coliseum's website, Ms. Hill purchased four tickets to the concert through Defendant's website for $149.00 each. In addition to the aggregate ticket price, Plaintiffs paid a shipping charge of $11.95 and a fee for Defendant's services of $59.60, increasing the total amount of her order to $667.55. Tickets to the Hannah Montana concert had a face value of $56.00 apiece.

The tickets that Ms. Hill purchased were sold by Justin Holohan, an accountant living in Massachusetts who had sold hundreds of tickets using Defendant's website. Mr. Holohan owned the tickets in question and selected the sale price. Mr. Holohan did not remember if he used any pricing information function available through Defendant's website to arrive at the price he selected for the tickets purchased by Ms. Hill.

At the time that he registered to use Defendant's website, Mr. Holohan provided various items of personal information and agreed to abide by Defendant's User Agreement. In the event that a prospective buyer offered to purchase a ticket that Mr. Holohan had listed on Defendant's website, he would receive an email from Defendant asking if he wanted to accept the offer. If Mr. Holohan accepted the buyer's offer, he would print out a prepaid FedEx™ label and use that label to ship the tickets to the purchaser. Defendant functioned as an intermediary between the purchasers and Mr. Holohan, collected credit card information from buyers, and provided him with a marketplace in which he could sell tickets "to an anonymous party."

### B.  Procedural History

On 17 October 2007, Plaintiffs filed a complaint, both individually and as representatives of a proposed class consisting of "all others similarly situated," against Defendant; "John Doe Seller 1," the individual who sold the Hannah Montana tickets to Ms. Hill; and "John Doe Sellers 2," other sellers of tickets using Defendant's website. In their complaint, which was subsequently amended on two occasions to assert additional factual allegations concerning the manner in which Defendant's website operated and to substitute Mr. Holohan for "John Doe Seller 1," Plaintiffs alleged that they had purchased four tickets to the Hannah Montana concert at substantially in excess of face value and that the Defendant's fee exceeded $3.00 per ticket. As a result, Plaintiffs claimed that they were entitled to recover compensatory and punitive damages based upon Defendant's alleged violation of N.C. Gen. Stat. § 14-344, a statute making it unlawful to sell a ticket for more than $3.00 over its face value; Defendant's deci-

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

sion, along with the other defendants, to participate in a civil conspiracy to violate N.C. Gen. Stat. § 14-344; tortious action in concert by Defendant and the other defendants; and the fact that Defendant had allegedly engaged in an unfair and deceptive trade practice in violation of N.C. Gen. Stat. § 75-1.1.

On 21 April 2008, Defendant moved for dismissal of Plaintiffs' complaint pursuant to N.C. Gen. Stat. § 1A-1, Rule 12(b)(6) on the grounds that "Section 230 of the Communications Decency Act (47 U.S.C. § 230) preempts the application of state law and provides a complete immunity to Plaintiffs' claims." On 21 July 2008, the trial court entered an order dismissing all of Plaintiffs' claims except for their unfair and deceptive trade practices claim.

On 3 September 2008, Defendant filed an answer to Plaintiffs' complaint in which it denied the material allegations set out in that pleading and asserted various affirmative defenses, including a contention that Plaintiffs' claim was barred by 47 U.S.C. § 230. On 25 October 2010, Plaintiffs filed a motion for summary judgment. On 4 March 2011, the trial court entered an order determining that Defendant was not entitled to immunity from liability pursuant to 47 U.S.C. § 230, that Defendant had violated N.C. Gen. Stat. § 14-344, that Defendant's conduct constituted an unfair and deceptive trade practice, and that Plaintiffs were entitled to judgment in their favor in an undetermined amount with respect to the individual claims that they had lodged against Defendant pursuant to N.C. Gen. Stat. § 75-1.1. Defendants noted an appeal to this Court from the trial court's order.

## II. Legal Analysis

### A. Appealability

**[1]** According to N.C. Gen. Stat. § 1A-1, Rule 54(a), a "judgment is either interlocutory or the final determination of the rights of the parties." "An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy." *Veazey v. Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381; *reh'g denied*, 232 N.C. 744, 59 S.E.2d 429 (1950)). Given that the trial court's order granted summary judgment in favor of Plaintiffs with respect to their individual claims without making a specific damage award or addressing Plaintiffs' request for class certification, the order from which Defendant has attempted to appeal is clearly interlocutory in nature.

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

As a general proposition, "there is no right of immediate appeal from interlocutory orders and judgments." *Travco Hotels, v. Piedmont Natural Gas Co.*, 332 N.C. 288, 291, 420 S.E.2d 426, 428 (1992) (citing *Goldston v. American Motors Corp.*, 326 N.C. 723, 725, 392 S.E.2d 735, 736 (1990). However, immediate appellate review of an interlocutory order is available "when the trial court enters a final judgment as to one or more, but fewer than all, claims or parties and certifies that there is no just reason for delay" pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b) or when "the interlocutory order affects a substantial right under N.C. Gen. Stat. § 1-277(a) and N.C. Gen. Stat. § 7A-27(d). *Sharpe v. Worland*, 351 N.C. 159, 161-62, 522 S.E.2d 577, 579 (1999) (citing *DKH Corp. v. Rankin-Patterson Oil Co.*, 348 N.C. 583, 585, 500 S.E.2d 666, 668 (1998), and *Ostereicher v. Stores*, 290 N.C. 118, 121-22, 225 S.E.2d 797, 800 (1976). Although the trial court appears to have attempted to include a certification pursuant to N.C. Gen. Stat. § 1A-1, Rule 54(b) in its summary judgment order and although Defendant contends that the trial court's order is immediately appealable on "substantial right" grounds pursuant to N.C. Gen. Stat. § 1-277(a) and N.C. Gen. Stat. § 7A-27(d), we need not determine whether the trial court's summary judgment order is appealable as a matter of right since we have decided to assert jurisdiction over this case on other grounds.

On 24 March 2011, Defendant filed a petition for *certiorari* requesting that, in the event that we concluded that the trial court's summary judgment order was not immediately appealable, we grant *certiorari* because the principal issue before the Court was the extent, if any, to which Defendant was immune from liability pursuant to 47 U.S.C. § 230; because immediate review in this instance would promote judicial economy; and because the present case involves issues of first impression in North Carolina. Although Plaintiffs opposed Defendant's request for the issuance of a writ of certiorari, we conclude, in the exercise of our discretion, that granting the requested writ of *certiorari* would further the interests of justice in this case. *Stetser v. TAP Pharm. Prods., Inc.*, 165 N.C. App. 1, 12, 598 S.E.2d 570, 578-79 (2004) (granting *certiorari* review given "the significant impact of this lawsuit, the importance of the issues involved and the need for efficient administration of justice"). As a result, we conclude that the requested writ of *certiorari* should be issued and that Defendant's challenges to the trial court's summary judgment order should be reviewed on the merits.

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

### B. Standard of Review

A trial court properly grants summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c). "A party moving for summary judgment may prevail if it meets the burden (1) of proving an essential element of the opposing party's claim is nonexistent, or (2) of showing through discovery that the opposing party cannot produce evidence to support an essential element of his or her claim." *Lowe v. Bradford*, 305 N.C. 366, 369, 289 S.E.2d 363, 366 (1982) (citations omitted). "[O]nce the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784-85, 534 S.E.2d 660, 664, *disc. review denied*, 353 N.C. 262, 546 S.E.2d 401 (2000), *cert. denied*, 353 N.C. 371, 547 S.E.2d 810, *cert. denied*, 534 U.S. 950, 122 S. Ct. 345, 151 L. Ed. 2d 261 (2001). A trial court's decision to grant a summary judgment motion is reviewed on a *de novo* basis. *Va. Electric and Power Co. v. Tillett*, 80 N.C. App. 383, 385, 343 S.E.2d 188, 191, *cert. denied*, 317 N.C. 715, 347 S.E.2d 457 (1986). As a result of the fact that the record does not, as the parties appear to agree, disclose the presence of any genuine issue of material fact, the ultimate question for our consideration is whether the trial court appropriately concluded that Plaintiffs were entitled to judgment as a matter of law with respect to their individual unfair and deceptive trade practices claim.

### C. Substantive Legal Issues

### 1. Introduction

The undisputed record evidence establishes that the face value of each of the tickets at issue here was $56 and that each ticket that Mr. Holohan sold to Ms. Hill cost $149, a figure that substantially exceeded the limitation on secondary sales set out in N.C. Gen. Stat. § 14-344 (providing that "[a]ny person, firm, or corporation shall be allowed to add a reasonable service fee to the face value of the tickets sold" in an amount "not [to] exceed three dollars ($3.00) for each ticket" and that "[a]ny person, firm or corporation which sells or offers to sell a ticket for a price greater than the price permitted by

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

this section . . . shall be guilty of a Class 2 misdemeanor");[2] that Mr. Holohan owned the tickets, established the sale price, and received the sales proceeds, less Defendant's 10% service charge; and that Plaintiffs paid a shipping charge and service fee to Defendant. According to Plaintiffs, the trial court correctly determined that Defendant violated N.C. Gen. Stat. § 14-344 on the grounds that (1) Defendant sold the tickets for an amount in excess of the statutorily prescribed maximum and that (2) Defendant charged an excessive buyer's fee. In response, Defendant contends that it did not sell the tickets to Ms. Hill, so that it was not subject to limitations on the amount of permissible fees set out in N.C. Gen. Stat. § 14-344. In addition, Defendant argues that it may not be held liable to Plaintiffs based upon the price at which Mr. Holohan chose to sell his tickets in light of the immunity provisions set out in 47 U.S.C. § 230. In response, Plaintiffs argue that Defendant should be deemed responsible for developing the relevant content that appeared on its website, which consists of the price at which Mr. Holohan elected to sell his tickets, so that the exemption from liability created by 47 U.S.C. § 230 does not apply. In granting summary judgment in favor of Plaintiffs, the trial court determined that Defendant was at least partially responsible for the sale price that Mr. Holohan established and had, for that reason, been "stripped of any immunity" arising under 47 U.S.C. § 230 and that Defendant was subject to the fee limitations set out in N.C. Gen. Stat. § 14-344. After carefully scrutinizing the record and studying the applicable law, we conclude (1) that a proper inquiry into the extent to which Defendant is entitled to claim immunity from liability pursuant to 47 U.S.C. § 230 must focus upon the specific content at issue in this case, which is the price at which Mr. Holohan sold the tickets to Ms. Hill; (2) that, after construing the provisions of 47 U.S.C. § 230 in light of the facts of this case, Defendant is entitled to immunity from any liability arising from the ticket price established by Mr. Holohan; and (3) that Defendant did not "sell" the tickets to Ms. Hill or act as the seller's agent, thereby falling outside the scope of the fee limitation provision set out in N.C. Gen. Stat. § 14-344. As a result, we conclude that the trial court's order should be reversed and that this case should be remanded to the trial court for the entry of summary judgment in favor of Defendant.

2. After Plaintiffs initiated the present case, the General Assembly amended N.C. Gen. Stat. § 14-344 and added N.C. Gen. Stat. § 14-344.1 to exempt internet ticket sales accompanied by a ticket assurance guarantee from the strictures otherwise established by that statutory provision.

## 2. 47 U.S.C. § 230(c)(1)

[2] The central issue before the trial court was the extent, if any, to which Plaintiffs' claims were barred by 47 U.S.C. § 230, which provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." As a result, the proper resolution of this case hinges upon the manner in which 47 U.S.C. § 230 should be interpreted.

In the event that issues arising in a case pertain to federal statutes, we are bound by the Supreme Court of the United States' interpretation of the federal statutes involved. *Bouligny, Inc. v. Steelworkers*, 270 N.C. 160, 174, 154 S.E.2d 344, 356 (1967) ("a decision of the Supreme Court of the United States, construing an act of Congress, is conclusive and binding on this court. On the other hand, "North Carolina appellate courts are not bound, as to matters of federal law, by decisions of federal courts other than the United States Supreme Court." *Enoch v. Inman*, 164 N.C. App. 415, 420-21, 596 S.E.2d 361, 365 (2004) (citing *Security Mills v. Trust Co.*, 281 N.C. 525, 529, 189 S.E.2d 266, 269 (1972)). However, although they are "not binding on North Carolina's courts, the holdings and underlying rationale of decisions rendered by lower federal courts may be considered persuasive authority in interpreting a federal statute." *McCracken & Amick, Inc. v. Perdue*, 201 N.C. App. 480, 488, n.4, 687 S.E.2d 690, 695 n.4 (2009) (citing *Security Mills*, 281 N.C. at 529, 189 S.E.2d at 269), *disc. review denied*, 364 N.C. 241, 698 S.E.2d 400 (2010). As a result of the fact that the United States Supreme Court has not yet addressed the scope of the immunity from liability made available by 47 U.S.C. § 230 and the fact that neither this Court nor the Supreme Court of North Carolina have, as of the present date, had a chance to construe 47 U.S.C. § 230, we will look to decisions of the lower federal courts and other state courts that we deem persuasive in attempting to properly interpret the relevant statutory language.

As the United States Court of Appeals for the Fourth Circuit has noted:

> . . . Congress carved out a sphere of immunity from state lawsuits for providers of interactive computer services[.] . . . [47 U.S.C.] § 230 prohibits a "provider or user of an interactive computer service" from being held responsible "as the publisher or speaker of any information provided by another information content provider." § 230(c)(1).

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 254 (4th Cir. 2009) (citing *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), *cert. denied*, 524 U.S. 937, 118 S. Ct. 2341, 141 L. Ed. 2d 712 (1998)).

> Although this court has not previously interpreted [47 U.S.C. §] 230, we do not write on a blank slate. The other courts that have addressed these issues have generally interpreted Section 230 immunity broadly, so as to effectuate Congress's "policy choice . . . not to deter harmful online speech through the . . . route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." . . . In light of these policy concerns, we too find that Section 230 immunity should be broadly construed.

*Universal Communication v. Lycos, Inc.*, 478 F.3d 413 418-19 (1st Cir. 2007) (quoting *Zeran* at 330-31 and citing *Carafano v. Metroplash.com, Inc.*, 339 F.3d 1119, 1123-24 (9th Cir. 2003), and *Ben Ezra, Weinstein, & Co. v. America Online Inc.*, 206 F.3d 980, 985, n.3, (10th Cir. 2000), *cert. denied*, 531 U.S. 824, 121 S. Ct. 69, 148 L. Ed. 2d 33 (2000)).

"The language of § 230 sets forth three criteria to qualify for the immunity provided. First, immunity is available only to a 'provider or user of an interactive computer service.' 47 U.S.C.A. § 230(c)(1). Second, the liability must be based on the defendant having acted as a 'publisher or speaker.' *Ibid.* Third, immunity can be claimed only with respect to 'information provided by another information content provider.' " *Milgram v. Orbitz Worldwide, Inc.*, 419 N.J. Super. 305, 317, 16 A.3d 1113, 1120-21 (2010). According to 47 U.S.C. § 230(f)(3), "[t]he term 'information content provider' means any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." As the Fourth Circuit explained in *Nemet Chevrolet:*

> Assuming a person meets the statutory definition of an "interactive computer service provider," the scope of § 230 immunity turns on whether that person's actions also make it an "information content provider." . . . Congress thus established a general rule that providers of interactive computer services are liable only for speech that is properly attributable to them.

*Nemet* at 254 (citing *Lycos*, 478 F.3d at 419; *Doe v. MySpace, Inc.*, 528 F.3d 413, 418-19 (5th Cir. 2008), *cert. denied*, 555 U.S. 1031, 129 S. Ct. 600, 172 L. Ed. 2d 456 (2008), *Chicago Lawyers' for Civil Rights v.*

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

*Craigslist*, 519 F.3d 666, 672 (7th Cir. 2008); and *Zeran*, 129 F.3d at 330-31). Given that the record clearly establishes that Defendant operates an "interactive computer service" and that Plaintiff's claim is predicated on the theory that Defendant should be held responsible for content, in the form of a ticket price that substantially exceeded face value, published on its website, the relevant issue is whether Defendant functioned as an "information content provider" with respect to the ticket price at issue here.

In *Fair Housing Coun., San Fernando v. Roommates.com*, 521 F.3d 1157 (9th Cir. 2008), a leading case concerning the scope of the exemption from liability granted by 47 U.S.C. § 230, which is cited extensively in the trial court's order, the defendant operated a website that matched people offering to rent spare rooms with persons looking for a place to live. In order to search or post information on the site, the user was required to answer a series of questions, with the only available responses being a set of options provided by the website addressing the user's gender, sexual orientation, family status, and roommate preferences as they related to these criteria. The user's responses to these questions became part of his or her profile, which could be supplemented with material generated exclusively by the user in a box marked "Additional Comments." A number of fair housing councils sued the defendant on the grounds that both the questionnaire and certain of the users' additional comments violated applicable fair housing statutes by allowing users to discriminate on the basis of gender, sexual orientation or family status. In evaluating the issues raised by the fair housing council's complaint, the United States Court of Appeals for the Ninth Circuit initially noted that:

> A website operator can be both a service provider and a content provider: If it passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself, or is "responsible, in whole or in part" for creating or developing, the website is also a content provider. Thus, a website may be immune from liability for some of the content it displays to the public but be subject to liability for other content.

*Roommates*, 521 F.3d at 1162-63 (citing *Anthony v. Yahoo! Inc.*, 421 F. Supp. 2d 1257, 1262-63 (N.D. Cal. 2006), *aff'd* 376 F. Appx. 775 (9th Cir. 2010). In addition, the Ninth Circuit stated that:

[We] interpret the term "development" as referring not merely to augmenting the content generally, but to materially contributing to its alleged unlawfulness. In other words, a website helps to develop unlawful content, and thus falls within the exception to section 230, if it contributes materially to the alleged illegality of the conduct.

*Roommates* at 1167-68. As a result, in the Ninth Circuit's view, a proper analysis of a defendant's request for immunity based upon 47 U.S.C. § 230 necessarily hinges upon the extent to which the website "materially contributed" to the development of unlawful content.

In analyzing the specific claims that the fair housing councils asserted against the website at issue in *Roommates*, the Ninth Circuit held that the website was not exempt from liability with respect to the information that was posted in response to the specific questions posed to persons seeking housing on the grounds that, since the website selected the questions and limited the range of possible answers, it became an information content provider with respect to the information generated in response to those questions.

[T]he part of the profile that is alleged to offend the Fair Housing Act and state housing discrimination laws—the information about sex, family status and sexual orientation—is provided by subscribers in response to Roommate's questions, which they cannot refuse to answer if they want to use defendant's services. By requiring subscribers to provide the information as a condition of accessing its service, and by providing a limited set of pre-populated answers, Roommate becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information.

*Roommates* at 1166. On the other hand, the Ninth Circuit determined that the website was entitled to immunity with respect to any claims arising from information set out in the "Additional Comments" box, since the users had the unlimited ability to determine the content of the material that was posted in that location. As a result of the general acceptance by other federal and state courts of the rubric deemed appropriate in *Roommates*, the appellate cases addressing immunity claims arising under 47 U.S.C. § 230 have analyzed the specific content alleged to be unlawful rather than examining the entire website on a more generic basis.

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

According to our research, there have been approximately 300 reported decisions addressing immunity claims advanced under 47 U.S.C. § 230 in the lower federal and state courts. All but a handful of these decisions find that the website is entitled to immunity from liability. The limited number of decisions which decline to find immunity pursuant to 47 U.S.C. § 230 include *Roommates*, which we have discussed above, and another decision upon which the trial court placed particular emphasis, *FTC v. Accusearch, Inc.*, 570 F.3d 1187 (10th Cir. 2009).

In *Accusearch*, the defendant operated a website that solicited requests to purchase the phone records of third parties, with those records having been obtained through the efforts of paid "researchers." In determining that the website was not entitled to immunity from liability pursuant to 47 U.S.C. § 230 with respect to that material, the United States Court of Appeals for the Tenth Circuit held that a website "[wa]s 'responsible' for the development of offensive content only if it in some way specifically encourages development of what is offensive about the content." *Accusearch* at 1199.

> [T]he offending content was the disclosed confidential information . . . Accusearch was responsible for the development of that content[.] . . . Accusearch solicited requests for such confidential information and then paid researchers to obtain it. . . . Accusearch knew that its researchers were obtaining the information through fraud or other illegality.

*Id.* In concluding that the website was not immune from liability under 47 U.S.C. § 230, the Tenth Circuit emphasized the fact that obtaining the personal phone records of third parties is almost always unlawful.[3] As a result, the relevant portion of the website's business consisted of paying "researchers" to illegally obtain information and providing the illegally obtained information to its customers, a set of actions which deprived the website of the ability to rely on the immunity provided by 47 U.S.C. § 230.

The analysis utilized in other decisions holding websites liable despite the immunity provisions of 47 U.S.C. § 230 is similar to that deemed appropriate in *Accusearch* and *Roommates*. For example, in *Jones v. Dirty World Entm't Recordings, LLC*, 2012 U.S. Dist. LEXIS

---

3. The exceptions to this general rule, which apply to situations such as provision of emergency services, billing for telecommunications services, and emergency situations involving a risk of death, would not be likely to stimulate an inquiry from a private person.

2525 *11 (E.D. Ky. Jan. 10, 2012), the website operator was found to have participated in the development of defamatory posts by appending a "tagline" to the postings of others and adding his own comments, actions "which a jury could certainly interpret as adopting the preceding allegedly defamatory comments." In other words, once again, liability was predicated upon the website's decision to affirmatively adopt or ensure the presentation of unlawful material. As a result, we conclude that " '[n]ear-unanimous case law holds that Section 230(c) affords immunity to ICSs against suits that seek to hold an ICS liable for third-party content' " and that "courts consistently have held that [47 U.S.C.] § 230(c)(1) offers broad immunity for ICSs to stimulate robust avenues of speech." *Collins v. Purdue University*, 703 F. Supp. 2d 862, 877 (N.D. Ind. 2010) (quoting *Chicago Lawyers' Comm., Civ. Rights v. Craigslist, Inc.*, 461 F.Supp.2d 681, 689 (N.D. Ill. 2006) (listing a large number of cases upholding a finding of immunity pursuant to 47 U.S.C. § 230), *aff'd*, 519 F.3d 666 (7th Cir. 2008)), *partial summary judgment granted on other grounds by Collins v. Purdue Univ.*, 2011 U.S. Dist. LEXIS 31013 (N.D. Ind. Mar. 23, 2011).

The reported decisions construing the immunity provisions of 47 U.S.C. § 230 have rejected a number of efforts to expand the range of factual situations in which a website is deprived of the immunity from liability provided by that statutory provision. For example, in *Zeran*, the plaintiff was the victim of a hoax in which

> an unidentified person posted a message on an AOL bulletin-board advertising "Naughty Oklahoma T-Shirts." The posting described the sale of shirts featuring offensive and tasteless slogans related to the April 19, 1995, bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Those interested in purchasing the shirts were instructed to call "Ken" at Zeran's home phone number[.] . . . As a result of this anonymously perpetrated prank, Zeran received a high volume of calls, comprised primarily of angry and derogatory messages, but also including death threats. . . . [When a radio station publicized the post,] Zeran was inundated with death threats and other violent calls from Oklahoma City residents.

*Zeran*, 129 F.3d at 329. Mr. Zeran sued AOL, arguing that it was liable for failing to remove the post after Zeran had provided specific notice of the website's defamatory nature. On appeal, the Fourth Circuit upheld the website's immunity claim, stating that:

[Zeran] contends that interpreting [47 U.S.C.] § 230 to impose liability on service providers with knowledge of defamatory content on their services is consistent with the statutory purposes[.] Zeran fails, however, to understand the practical implications of notice liability in the interactive computer service context. . . . Because the probable effects of distributor liability on the vigor of Internet speech and on service provider self-regulation are directly contrary to § 230's statutory purposes, we will not assume that Congress intended to leave liability upon notice intact.

*Zeran* at 333. As a result, "[i]t is, by now, well established that notice of the unlawful nature of the information provided is not enough to make it the service provider's own speech." *Lycos*, 478 F.3d at 420 (citing *Zeran*, 129 F.3d at 332-33) (other citation omitted).

Similarly, the decisions construing 47 U.S.C. § 230 have generally held that, if the tools provided by a website may be used to generate either lawful or unlawful content depending on decisions made by the user, these tools are "neutral" and do not implicate the website in the development of unlawful content. Thus, in *Jurin v. Google, Inc.*, 695 F. Supp. 2d 1117 (E.D. Cal. 2010), the district court held that Google was immune from plaintiff's claims that Google's website had unlawfully used plaintiff's trademarked name "Styrotrim" as a suggested keyword in Google's "AdWords" program, which allows advertisers to bid on the words that appear as suggested search terms when a user began a search. Although the plaintiff argued that, by providing the keyword suggestion tool, Google became an "information content provider," the district court held that:

. . . Defendant does not provide the content of the "Sponsored Link" advertisements. It provides a space and a service and thereafter charges for its service. By suggesting keywords to competing advertisers Defendant merely helps third parties to refine their content. . . . Defendant's keyword suggestion tool hardly amounts to the participation necessary to disqualify it of CDA immunity. Rather it is a "neutral tool," that does nothing more than provide options that advertisers could adopt or reject at their discretion, thus entitling the operator to immunity.

*Jurin*, 695 F. Supp. 2d at 1123 (citing *Goddard v. Google, Inc.*, 640 F. Supp. 2d 1193, 1197-98 (N.D. Cal. 2009)).

**HILL v. STUBHUB, INC.**

[219 N.C. App. 227 (2012)]

Moreover, the fact that a website operates a commercial business or makes a profit has no relevance to the immunity determination. As one district court has recently explained:

> The complained-of actions taken by Backpage to increase the revenues it derives from its website, *e.g.*, touting its website as a "highly tuned marketing site" and instructing posters of ads on how to best increase the impact of those ads, do[] not defeat § 230 immunity. "[T]he fact that a website elicits online content for profit is immaterial; the only relevant inquiry is whether the interactive service provider 'creates' or 'develops' that content." . . . In the instant case, to find Backpage to be not immune from suit based on M.A.'s allegations about how it structured its website in order to increase its profits would be to create a for-profit exception to § 230's broad grant of immunity. This the Court may not do.

*M.A. v. Vill. Voice*, 2011 U.S. Dist. LEXIS 90588 at *23-24 (E.D. Mo. 2011) (quoting *Goddard v. Google*, 2008 U.S. Dist. LEXIS 101890, at *3 (N.D. Cal. 2008), and citing *Lycos* 478 F.3d at 420-21 (stating that a website operator did not become an information content provider "merely because the 'construct and operation' of the web site might have some influence on the content of the postings") and *Carafano*, 339 F.3d at 1124 (stating that a questionnaire employed by a dating service website to facilitate the creation of profiles did not transform the website into an information content provider since all content selection decisions were made by posters and since no profile would have any content in the absence of creative activity by the poster) (other citation omitted).

Similarly, the fact that a website acted in such a manner as to encourage the publication of unlawful material does not preclude a finding of immunity pursuant to 47 U.S.C. § 230. For example, in *Ascentive, LLC v. Opinion Corp.*, 2011 U.S. Dist. LEXIS 143081 (E.D.N.Y. Dec. 13, 2011), the plaintiff claimed that "[the defendant] acted as an 'information content provider' by, among other things, (1) encouraging negative complaints; (2) inviting consumers to post public complaints on its website; (3) displaying those negative postings as prominently as possible . . . ; and (4) increasing the prominence of [the defendant's] webpages by various allegedly improper means, including by using plaintiffs' [trade]marks." *Ascentive* at *69. In rejecting this contention, the district court held that:

> [T]here is simply "no authority for the proposition that [encouraging the publication of defamatory content] makes the website operator responsible, in whole or in part, for the 'creation or development' of every post on the site. . . . Unless Congress amends the [CDA], it is legally (although perhaps not ethically) beside the point whether defendants refuse to remove the material, or how they might use it to their advantage."

*Ascentive* at *69. (quoting *Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F. Supp. 2d 929, 933 (D. Ariz. 2008) (holding that "ripoffreport.com" was not an information content provider even though the defendants allegedly encouraged defamatory reviews by others for their own financial benefit).

Finally, the decisions construing 47 U.S.C. § 230 have declined invitations to exempt the "negligent publishing" of offensive or unlawful content from the protections afforded by 47 U.S.C. § 230. For example, in *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 967-68 (N.D. Ill. 2009), the plaintiff, who served as the Sheriff of Cook County, sued Craigslist on the basis of allegations that the website's adult section constituted a public nuisance. After noting that "Sheriff Dart's complaint could be construed to allege 'negligent publishing,' " the district court rejected any contention that negligence sufficed to overcome the immunity granted by 47 U.S.C. § 230, noting that "[a] claim against an online service provider for negligently publishing harmful information created by its users treats the defendant as the 'publisher' of that information." (citing *Chicago Lawyers' Committee*, 461 F. Supp. 2d 681, and *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (other citation omitted)). As a result, the reported decisions construing 47 U.S.C. § 230 have treated the relevant statutory language as creating a broad exemption from liability even when the substantive facts underlying a plaintiff's claim are compelling. *See, e.g.*, *M.A.*, 2011 U.S. Dist. LEXIS 90588 (holding that immunity was available pursuant to 47 U.S.C. § 230 despite the fact that a minor was subjected to sex trafficking as the result of ads placed on defendant's website) and *Barnes*, 570 F.3d at 1098 (holding that immunity was available pursuant to 47 U.S.C. § 230 based upon a website's failure to remove defamatory postings despite the fact that the "case stems from a dangerous, cruel, and highly indecent use of the internet for the apparent purpose of revenge").

Thus, after carefully reviewing decisions such as *Roommates* and *Accusearch*, in which websites were deprived of the opportunity to claim immunity under 47 U.S.C. § 230, we conclude that:

Those cases . . . are easily distinguishable [from the present case]. In *Roommates.com*, the non-parties providing the data were required to post actionable material to the defendant website as a condition of use, and the website's "work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanism [was] directly related to the alleged illegality of the site." . . . This case also differs considerably from *Accusearch Inc.*, where the defendant website paid researchers to obtain information for the site to disseminate that "would almost inevitably require [the researcher] to violate the Telecommunications Act or to circumvent it by fraud or theft." There is no comparable allegation against [Defendant].

*Shiamili v Real Estate Group of New York*, 17 N.Y.3d 281, 292, 952 N.E.2d 1011, 1019 (2011) (quoting *Roommates*, 521 F3d at 1172 and *Accusearch Inc.*, 570 F3d at 1191-92). For that reason, we further conclude that, in order to lose the benefit of the exemption from liability granted by 47 U.S.C. § 230 based upon content actually posted by third parties, an analysis of the results reached in persuasive decisions from other jurisdictions establishes that, in order to "materially contribute" to the creation of unlawful material, a website must effectively control the content posted by those third parties or take other actions which essentially ensure the creation of unlawful material. Although the record might support a determination that Defendant encouraged the posting of "market-based" prices on its website or was cognizant of the risk that tickets sold on its website would be priced in excess of face value, such evidence does not suffice to support a conclusion that Defendant's website essentially ensured that unlawful content would be posted.

### 3. Analysis of Trial Court's Order

[3] Although the trial court concluded that Defendant was "in total control of the transaction" and stated that "[t]he only thing [that Defendant] does not do is enter the actual price or make the final price decision for most sellers," the undisputed evidence establishes that Mr. Holohan was the owner of the Hannah Montana tickets that Ms. Hill purchased and that Mr. Holohan, rather than Defendant, set the price of the tickets. The trial court did not determine, and the record does not indicate, that Defendant priced the tickets, directed or required Mr. Holohan to charge a particular ticket price, or acted as Mr. Holohan's agent in making that determination. As a result, we

HILL v. STUBHUB, INC.

[219 N.C. App. 227 (2012)]

conclude, consistently with the undisputed evidence and the language of the trial court's order, that Defendant was not "responsible, in whole or in part," for creating or developing the content at issue here, which is the price at which Mr. Holohan sold his tickets, and, for that reason, that Defendant is immune from liability pursuant to 47 U.S.C. § 230 as the result of claims based upon that particular content.

A careful review of the trial court's order reflects that, instead of focusing upon the specific content at issue in this case, the trial court determined that Defendant's website, considered as a whole, was not entitled to immunity from liability pursuant to 47 U.S.C. § 230. As part of this process, the trial court placed considerable emphasis on certain business practices in which Defendant engaged and certain features of Defendant's website that the trial court believed to encourage the reselling of tickets at a price substantially above face value. Reduced to its essence, the trial court's analysis rests upon the belief that, since Defendant's "business model" and various features of Defendant's website tended to provide incentives for the selling of tickets at a price above face value, the website, viewed in its entirety, was not immune from liability pursuant to 47 U.S.C. § 230. We conclude, however, that the trial court's "entire website" approach was fatally flawed in a number of respects.

In the course of adopting this erroneous "entire website" approach, the trial court discussed the features that Defendant made available to ticket sellers who sold large numbers of tickets and addressed the impact that actions taken by such "large sellers" might have on ticket prices. However, the undisputed record evidence establishes that Mr. Holohan was not a "large seller," so those features had no impact on the generation of the allegedly unlawful content. Similarly, the trial court discussed contracts between Defendant and musical performers despite the fact that such agreements had nothing to do with the present transaction. As a result, this aspect of the trial court's reasoning simply had no bearing on the required immunity analysis.

The trial court also predicated its determination that Defendant was not entitled to take advantage of the immunity made available by 47 U.S.C. § 230 based, at least in part, upon the nature of the various customer service features that were made available through Defendant's website. According to the trial court, Defendant "controlled" the transaction by acting as an intermediary between buyer and seller. In addition, the trial court noted that Defendant offered

HILL v. STUBHUB, INC.

[219 N.C. App. 227 (2012)]

both buyers and sellers certain guarantees and assumed responsibility for handling the mechanics required to complete the transaction. The extent to which the features made available by Defendant are worth the fee that Defendant charges for its services is a decision which must be made by each individual buyer and seller. However, none of these features had any impact on the extent to which Mr. Holohan had complete control over the price at which he chose to resell the Hannah Montana tickets at issue here, rendering those features irrelevant for purposes of determining the extent to which Defendant was entitled to immunity pursuant to 47 U.S.C. § 230.

In addition, the trial court discussed the pricing tools available to users of Defendant's website and suggested that these tools encouraged sellers to price tickets unlawfully. A number of the tools mentioned in the trial court's order were only available to large volume sellers, such as assistance in uploading tickets in bulk or calculating the desired price, and had no bearing on Mr. Holohan's pricing decisions for that reason. However, certain other features upon which the trial court relied were more widely available, such as the information that Defendant provided to sellers concerning the prices at which tickets to the same event had been sold by others. The pricing feature in question is, however, a prototypically "neutral tool," since that feature merely provided additional information to sellers without suggesting, much less requiring, that they should adjust the prices that they were charging for certain tickets. As a result, none of these aspects of the trial court's factual analysis operated to deprive Defendant of the immunity established by 47 U.S.C. § 230.

Aside from its reliance upon information that did not bear upon the price that Mr. Holohan charged Ms. Hill for tickets to the Hannah Montana concert, the trial court's decision rests upon certain legal conclusions that are inconsistent with the decisions reached by other courts whose reasoning we find persuasive. For example, the trial court stated that "[c]onscious disregard by an internet service provider of known and persistent violations of law by content providers may impact the courts' determinations of the service provider's claim to immunity, especially where the ISP profits from the violations," and that the use of Defendant's "website to scalp tickets in violation of North Carolina law was a predictable consequence of [Defendant's] business model." As we have already demonstrated, however, the prevailing tendency among decisions construing the relevant statutory language is to hold that the immunity provided by 47 U.S.C. § 230 is (1) not defeated by evidence tending to show that

HILL v. STUBHUB, INC.

[219 N.C. App. 227 (2012)]

the website had notice of the unlawful posting; (2) not affected by the fact that a website attempts to earn a profit; and (3) not subject to any liability on the basis of "reasonable foreseeability" or "willful blindness" analysis. Thus, the fact that Defendant may have been on notice that its website could be used to make unlawful sales and that certain of Defendant's practices may have provided incentives for the over-pricing of certain tickets does not support a decision stripping Defendant of its immunity under 47 U.S.C. § 230.

In its order, the trial court also placed considerable reliance upon *NPS, LLC v. StubHub, Inc.*, 25 Mass L. Rep. 478, 2009 Mass. Super. LEXIS 97 (2009), a decision rendered by a trial court judge in Massachusetts. In *NPS*, the trial court denied Defendant's motion for summary judgment directed toward the plaintiff's intentional interference with advantageous relations claim. In that case, although denying that it had acted on the basis of an improper motive, the defendant "essentially concede[d]" that it had knowingly induced season ticket holders to breach their contract with the plaintiff, a professional football team. Aside from the fact that the evidentiary and procedural context present in *NPS* is substantially different from that before the Court in this case, we simply do not find the reasoning employed by *NPS* persuasive, believe that it is inconsistent with the decisions concluding that knowledge of unlawful content does not strip a website of the immunity from liability granted under 47 U.S.C. § 230,, and decline to follow it in deciding the present case.[4]

Finally, the trial court discussed a hypothetical situation in reaching its decision that we believe to be readily distinguishable from the facts of this case. In its order, the trial court stated that, "if a StubHub employee offered to sell another person's tickets to the ACC Tournament at scalper's prices in front of the coliseum, that employee would have violated the statute even though they did not set the price for the owner." However, unlike the situation posited in the trial court's hypothetical, the present record contains no indication that Defendant acted as Mr. Holohan's agent in setting the challenged ticket price. Instead, the undisputed evidence establishes that Defendant simply functioned as a broker, effectively putting a buyer and a seller into contact with each other in order to facilitate a sale

---

4. Similarly, the decision of the United States Court of Appeals for the Seventh Circuit in *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363 (7th Cir. 2010), has no real bearing upon the proper resolution of this case given that the issue before the Seventh Circuit in that case was the extent, if any, to which Defendant was required to remit certain taxes rather than the extent, if any, to which Defendant was liable for allegedly unlawful third party content.

at a price established by the seller. As a result, for all of these reasons, we conclude that Defendant was entitled to claim the benefit of the immunity created by 47 U.S.C. § 230 and that this immunity operates to bar Plaintiffs' individual claim stemming from the price at which Ms. Hill purchased tickets to the Hannah Montana concert.

### 4. Fees Charged by Defendant

**[4]** In addition, the trial court concluded that Defendant was liable to Plaintiffs for violating N.C. Gen. Stat. § 14-344 based upon the fees that Defendant charged buyers such as Ms. Hill. Although Plaintiffs argue that Defendant should be held liable for collecting excessive fees as either the seller of the tickets or as the seller's agent, we conclude that the record does not establish that Defendant possessed either seller or agent status and cannot, for that reason, be held liable to Plaintiffs on fee-related grounds.

According to the version of N.C. Gen. Stat. § 14-344 applicable to this case, a person or entity is "allowed to add a reasonable service fee to the face value of the tickets sold" that "may not exceed three dollars ($3.00) for each ticket," with any person or entity "sell[ing] or offer[ing] to sell a ticket for a price greater than" the permissible price subject to a criminal sanction. The plain language of N.C. Gen. Stat. § 14-344 imposes liability upon either the seller or, presumably, the seller's agents.[5] As we have already indicated, the undisputed record evidence shows that Mr. Holohan sold the tickets in question, that Defendant provided an independent brokerage function rather than acting as Mr. Holohan's agent, and that the fees that Defendant charged related to its own services rather than services provided by Mr. Holohan. As a matter of fact, the user agreement to which Mr. Holohan agreed as a prerequisite for selling tickets on Defendant's website specifically states that "no agency, partnership, joint venture, employer-employee or franchisor-franchisee relationship is intended or created by this Agreement." As a result, we conclude that the undisputed evidence establishes that Defendant was neither a ticket seller nor the ticket seller's agent; that the fees that Defendant charges are not, for that reason, subject to the strictures of N.C. Gen. Stat. § 14-344; and that the trial court erred by making a contrary

---

5. Although Plaintiffs argue that the reference to "[a]ny person, firm or corporation" in that portion of N.C. Gen. Stat. § 14-344 authorizing the assessment of service charges demonstrates that the reach of the relevant statutory provision extends beyond sellers and their agents, we do not believe that the language in question can be read in that manner given that N.C. Gen. Stat. § 14-344 only sanctions the assessment of fees associated with the sale or resale of tickets.

determination in the course of granting summary judgment in favor of Plaintiffs.

## III. Conclusion

Thus, for the reasons set forth above, we conclude that, under 47 U.S.C. § 230, Defendant is entitled to immunity from Plaintiffs' claim stemming from the sale of tickets to the Hannah Montana concert at a price in excess of face value and that the fees that Defendant charges for its services did not violate N.C. Gen. Stat. § 14-344. In view of the fact that Plaintiff's unfair and deceptive trade practices claim hinged upon determinations that Defendant was not entitled to immunity pursuant to 47 U.S.C. § 230 and that Defendant charged fees in excess of those authorized by N.C. Gen. Stat. § 14-344, we further conclude that the trial court erred by granting summary judgment in favor of Plaintiffs with respect to their individual claims in reliance upon N.C. Gen. Stat. § 75-1.1 and that the trial court should, instead, have granted summary judgment in favor of Defendant with respect to those claims. As a result, the trial court's order should be, and hereby is, reversed and this case should be, and hereby is, remanded to Guilford County Superior Court for further proceedings not inconsistent with this opinion.

REVERSED.

Judges BEASLEY and THIGPEN concur.